## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

CHARLES MICHAEL WENTZ,       )
                                  )

         **Plaintiff,**        )

**v.**                               )       **Civil Action No. 2:22-00528**

                                    )

SUPERINTENDENT DONALD AMES, *et al.,*   )

                                  )

        **Defendants.**     )

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Defendants' Motion for Summary Judgment (Document No. 74), filed on January 3, 2025. The Court notified Plaintiff pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants in moving to dismiss. (Document No. 76.) On February 10, 2025, Plaintiff filed a Response in Opposition to Defendants' Motion. (Document No. 78.) Defendants filed their Reply on February 14, 2025. (Document No. 79.) Having examined the record and considered the applicable law, the undersigned has concluded that Defendants' Motion for Summary Judgment (Document No. 74) should be granted in part and denied in part. Specifically, it is recommended that Defendants' Motion be granted as to Plaintiff's official capacity claim against Defendants requesting monetary damages and denied concerning all other claims asserted against Defendants.

### PROCEDURAL BACKGROUND

On November 17, 2022, Plaintiff, acting *pro se,*[1] filed his Motion to Proceed Without

---

[1]  Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519,

Prepayment of Fees and Complaint claiming entitlement to relief pursuant to Title 42 U.S.C. § 1983. (Document Nos. 1 and 2.) In his Complaint, Plaintiff names the following as Defendants: (1) Donald Ames, Superintendent at Mount Olive Correctional Complex ("MOCC"); (2) Jonathan Frame, Associate Superintendent at MOCC; (3) Major Josh Ward, MOCC; (4) Jane Doe; (5) John Doe; and (6) Unknown Defendants. (Document No. 2.) Plaintiff alleges that the above Defendants violated his Eighth Amendment rights by subjecting him to unconstitutional conditions of confinement. (Id., pp. 4 – 5.) Specifically, Plaintiff states that Defendants knowingly placed him in danger resulting in him being severely injured. (Id.) Plaintiff explains that Defendants knowingly put him in danger by "not following laws, policies, and procedures by not having guards posted at all times on the yard." (Id.) As a result, Plaintiff alleges that he was "assaulted and nearly killed" on November 11, 2020. (Id.) Plaintiff alleges that due to Defendants' failure to protect him, "two inmates stomped up and down on [his] head and face." (Id.) Plaintiff states that he had to be "life flighted" to CAMC Hospital where he underwent a 15 hour surgery for severe facial fractures. (Id.) Plaintiff further explains that he had to be placed on a ventilator for several days. (Id.) Plaintiff states that he is still undergoing surgeries regarding his injuries. (Id.) Plaintiff explains that he has an upcoming surgery for the reconstruction of his eye lid. (Id.) As relief, Plaintiff's requests monetary damages. (Id.) As Exhibits, Plaintiff attaches the following: (1) A copy of his pertinent medical records (Document No. 2-1, pp. 1 - 23); and (2) A copy of his grievances (Id., pp. 24 – 28.)

By Order entered on February 21, 2023, the undersigned granted Plaintiff's Motion to Proceed Without Prepayment of Fees and directed the Clerk to issue process. (Document No. 8.)

---

520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

On March 6, 2023, Defendants filed their Motion to Dismiss and Memorandum in Support. (Document Nos. 13 and 14.) Defendants argued that Plaintiff's claims should be dismissed based on the following: (1) Plaintiff failed to assert his cause of action within the applicable statute of limitations (Id., pp. 3 – 4); (2) "Plaintiff's allegations against these Defendants are threadbare recitals of the elements of a cause of action supported by conclusory allegations that are not entitled to the presumption of truth" (Id., pp. 4 – 5); and (3) Plaintiff failed to exhaust his administrative remedies prior to the filing this action (Id., pp. 5 – 7). Notice pursuant to <u>Roseboro</u> was issued to Plaintiff on March 7, 2023, advising him of the right to file a response to the Defendants' Motion to Dismiss. (Document No. 15.) On March 29, 2023, Plaintiff filed his Response in Opposition. (Document No. 22.) As Exhibits, Plaintiff attached the following: (1) A copy of an Incident Report prepared by Officer Alan Moore dated November 11, 2020 (Document No. 22-1, pp. 1 – 2.); (2) A copy of an Incident Report prepared by Officer Matthew Isaacs dated November 11, 2020 (Id., pp. 3 – 4.); (3) A copy of an Incident Report prepared by Officer Amber Harless dated November 11, 2020 (Id., pp. 5 – 6.); and (4) The Affidavit of Inmate Roy E. Hillberry II (Document No. 23.). On April 5, 2023, Defendants filed their Reply. (Document No. 24.) On April 17, 2023, Plaintiff filed his Surreply.[2] (Document No. 26.) By Proposed Findings and Recommendation ("PF&R") entered on October 4, 2023, the undersigned recommended that the District Court deny Defendants' Motion to Dismiss (Document No. 13), grant Plaintiff permission to amend his Complaint to include the additional facts to support his Eighth Amendment claim, and refer the

---

[2] Local Rule of Civil Procedure 7.1(a)(7) provides that "[s]urreply memoranda shall not be filed except by leave of court." *See also Johnson v. Ford Motor Co.*, 2005 WL 2353469 (S.D.W.Va. Sept. 26, 2005)(stating that the "motion to strike is granted because plaintiff's surreply is not permitted by either the Federal or Local Rules of Civil Procedure.") Although Plaintiff failed to properly request leave of the Court to file his surreply, the Court was disinclined to strike Plaintiff's surreply from consideration in view of the less stringent standard applicable in this case by virtue of Plaintiff's *pro se* status. Defendants did assert new arguments in their Reply. The Court, therefore, considered Plaintiff's Surreply as properly filed.

matter back to the undersigned for further proceedings. (Document No. 32.) On October 18, 2023,
Defendants filed Objections. (Document No. 33.)

On October 26, 2023, Plaintiff filed his Proposed Amended Complaint. (Document No.
35.) Plaintiff states that he has now identified the unknown Jane/John Doe defendants as follows:
(1) Sergeant Matthew Isaacs, Correctional Officer at MOCC; (2) Corporal Dennis Cutlip,
Correctional Officer at MOCC; and (3) David Cavendish, Correctional Officer at MOCC. (Id., p.
1.) Plaintiff further states that the date of his attack needs to be amended from November 11, 2020,
to November 10, 2020. (Id., p. 1.) Plaintiff then set forth additional factual allegations against all
named defendants. (Id., pp. 2 – 5.) As Exhibits, Plaintiff attached Declarations in Support.
(Document No. 35-1.) On February 28, 2024, Plaintiff filed additional Exhibits in Support of his
Proposed Amended Complaint. (Document Nos. 40 and 40-1.)

By Memorandum Opinion and Order entered on March 6, 2024, United States District
Judge Irene C. Berger overruled Defendants' Objections, adopted the undersigned's PF&R, denied
Defendants' Motion to Dismiss, granted Plaintiff leave to amend his Complaint to add facts in
support of his Eighth Amendment claim, and referred the matter back to the undersigned for further
proceedings. (Document No. 43.) On March 21, 2024, Defendants Ames, Frame, and Ward filed
their Answer to Plaintiff's Amended Complaint. (Document No. 44.) By Order also entered on
March 21, 2024, the undersigned directed that Plaintiff's Proposed Amended Complaint
(Document No. 35) and attached Exhibits (Document Nos. 35-1, 40, 40-1) be re-docketed as
Plaintiff's Amended Complaint and Exhibits. (Document No. 46.) The undersigned further
directed that the Clerk substitute the Unknown, Jane/John Doe Defendants for the following
defendants: (1) Sergeant Matthew Isaacs, Correctional Officer at MOCC; (2) Corporal Dennis
Cutlip, Correctional Officer at MOCC; and (3) David Cavendish, Correctional Officer at MOCC.

4

(Id.) Finally, the undersigned directed the Clerk to issue process upon Defendants Isaacs, Cutlip, and Cavendish. (Id.) On April 16, 2024, Defendants Isaacs, Cutlip, and Cavendish filed their Answer. (Document No. 52.) On May 14, 2024, the undersigned entered a Scheduling Order setting forth deadlines for the completion of discovery and the filing of dispositive motions. (Document No. 54.)

On May 24, 2024, Plaintiff filed a Motion for Resubmission of Amended Complaint. (Document No. 55.) Specifically, Plaintiff requested permission to resubmit his Amended Complaint because he inadvertently failed to include his "Prayer for Relief" in his previously submitted Amended Complaint. (Id.) Plaintiff noted that he made no other changes to the content of his Amended Complaint. (Id.) As an Exhibit, Plaintiff attached a copy of his Revised Amended Complaint and Supporting Exhibits. (Document No. 55-1.) By Order entered on July 31, 2024, the undersigned granted Plaintiff's Motion and directed the Clerk to re-docket Plaintiff's proposed Amended Complaint and Supporting Exhibits as Plaintiff's Revised Amended Complaint and Exhibits. (Document No. 58.) As Supporting Exhibits, Plaintiff filed the following: (1) A copy of a Sworn Declaration of Inmate Joshua Harrison (Document No. 58-1, p. 1); (2) A copy of a Sworn Declaration of Inmate James Zell (Id., p. 2); (3) A copy of a Sworn Declaration of Inmate John D. New (Id., p. 3); and (4) A copy of a Sworn of Declaration of Inmate Brandon Shepard (Id., p. 4).

In his Revised Amended Complaint, Plaintiff alleges that Defendants acted with deliberate indifference to his safety and health on November 10, 2020, resulting in a violation of his constitutional rights. (Document No. 58.) As Defendants, Plaintiff names the following: (1) Donald Ames, Superintendent at MOCC; (2) Jonathan Frame, Associate Superintendent at MOCC; (3) Major Josh Ward, Correctional Officer at MOCC; (4) Sargent Matthew Isaacs, Correctional Officer at MOCC; (5) Corporal Dennis Cutlip, Correctional Officer at MOCC; and

5

(6) David Cavendish, Correctional Officer at MOCC. (Id.) Plaintiff states that on November 10, 2020, he was attacked by two inmates and nearly killed while in the main recreation yard at MOCC. (Id., p. 2.) Plaintiff complains that no correctional officers were present in the yard to "stop, interrupt, and possibly minimize the massive damage done to [him] during the attack." (Id.) Plaintiff alleges that Superintendent Ames "knew of and was completely aware of the serious risk of harm that existed [because] inmate murders and attacks on the [MOCC] main rec yard were longstanding and well documented over the years due to prison guards not being present on the yard 'hardly ever.'" (Id.) Plaintiff asserts that although Superintendent Ames knew the foregoing, he "continued to allow his subordinates to act or work in a manner of total disregard for [Plaintiff's] life and safety along with all other inmates." (Id.) Specifically, Plaintiff states that Superintendent Ames "NEVER took any corrective action or responsible measure to change this unreasonably high risk behavior by instead allowing his subordinate to continue to practice said tactics." (Id.)

As to Associate Superintendent Frame, Plaintiff states that Frame "deals directly with inmates and officers daily," "knows everything that goes on," and "about all the documented assaults, murders, etc. that happens on the main rec yard due to no officer presence." (Id., pp. 2 – 3.) Plaintiff asserts that despite the foregoing knowledge, Associate Superintendent Frame has allowed "this hostile environment to continue by allowing his officers to completely disregard their duty to protect." (Id., p. 3.) Plaintiff contends that Associate Superintendent Frame's inaction allowed Plaintiff to be "attacked and nearly murdered." (Id.)

As to Major Ward, Plaintiff alleges that Ward is aware of the dangers presented in the yard and of prior assaults and/or murders that have occurred in the yard. (Id.) Despite the foregoing knowledge, Plaintiff alleges that Major Ward knowingly allows his subordinate officers to not be present in the yard during their shifts. (Id.)

6

As to David Cavendish, Plaintiff alleges that Cavendish was "running shift" on the night of November 10, 2020. (Id., p. 4.) Plaintiff asserts that "[j]ust like every night, [Cavendish's] officers were not on the yard and Cavendish continues to allow this practice to go on knowing what has happened or what could happen at any minute on a maximum security yard with NO officers." (Id.) Plaintiff asserts that Cavendish "run his shift as a security threat daily with total disregard for inmates' lives and safety." (Id.)

As to Sargent Isaacs and Corporal Cutlip, Plaintiff alleges that both were assigned to patrol the main rec yard on the night of November 10, 2020. (Id., pp. 3 – 4.) Plaintiff asserts that neither Isaacs nor Cutlip were present on the yard at the time of the attack. (Id.) Plaintiff further states that similar to other nights, there was a lack of officer presence on the yard on November 10, 2020. (Id.) Plaintiff alleges that the lack of officer presence allowed two inmates to easily attack and nearly kill him. (Id.) Plaintiff requests declaratory, injunctive, and monetary relief. (Id., p. 6.)

On August 9, 2024, Defendants filed their Answer to Plaintiff's Revised Amended Complaint. (Document No. 59.) On August 19, 2024, Plaintiff filed a "Motion to Enlarge Time for Discovery." (Document No. 61.) Defendants filed a "Response to Plaintiff's Motion to Enlarge Time and Motion to Amend Scheduling Order." (Document No. 62.) Defendants stated that they joined Plaintiff's Motion and requested that the Court amend the currently established discovery and dispositive motions deadlines." (Id.) By Order entered on August 26, 2024, the undersigned granted Plaintiff and Defendants' Motions and set forth new deadlines for the completion of discovery and the filing of dispositive motions. (Document No. 66.) Plaintiff's deposition was conducted on December 11, 2024. (Document Nos. 72 and 74-1.)

On January 3, 2025, Defendants filed their Motion for Summary Judgment and Memorandum in Support. (Document Nos. 74 and 75.) First, Defendants argue that "[t]he

7

undisputed facts of this case primarily of Plaintiff's own admissions support a finding that all Defendants are entitled to qualified immunity." (Document No. 75, pp. 5 – 7.) Second, Defendants contend that the undisputed facts establish that Defendants were not deliberately indifferent to Plaintiff's safety and welfare. (Id., pp. 7 – 9.) As an Exhibit, Defendants attach a copy of Plaintiff's Deposition. (Document No. 74-1.) Notice pursuant to Roseboro was issued to Plaintiff on March 7, 2023, advising him of the right to file a response to the Defendants' Motion to Dismiss. (Document No. 15.) On February 10, 2025, Plaintiff filed his Response in Opposition and "Motion to Add Affidavit for Evidence." (Document Nos. 77 and 78.) In support of his "Motion to Add Affidavit for Evidence," Plaintiff states he recently discovered that Inmate Tex Holbrook was present and witnessed the attack upon Plaintiff. (Document No. 77.) Plaintiff, therefore, requests that Inmate Holbrook's Affidavit be considered in conjunction with his Response in Opposition. (Id.) As an Exhibit, Plaintiff attaches a copy of Inmate Holbrook's Affidavit. (Document No. 77-1.) By separate Order entered this day, the undersigned has granted Plaintiff's foregoing Motion. On February 14, 2025, Defendants filed their Reply. (Document No. 79.)

## <u>SUMMARY OF EVIDENCE</u>

**A.    Inmate Joshua Harrison's "Sworn Declaration":**

In his "Sworn Declaration," Inmate Harrison states that on January 25, 2017, he was "involved in a gang fight between DMIs and Muslims" in the yard at MOCC. (Document No. 58-1, p. 1 and Document No. 69-5, p. 12.) Inmate Harrison states "[t]here was over 50 inmates involved and [he] was stabbed in the head and neck several times." (Id.) Inmate Harrison states that during the fight, "there were no correctional officers on the yard for over an hour." (Id.)

**B.    Inmate James Zell's "Sworn Declaration":**

8

In his "Sworn Declaration," Inmate Zell states that he was "stabbed on the main recreation yard, pine hall patio, at Mount Olive Correctional Complex" in 2019." (Document No. 58-1, p. 2 and Document No. 69-5, p. 11.) Inmate Zell asserts that "three to four days later the guards came to strip [him] out and found [his] stab wound." (Id.) Inmate Zell states that "[t]he reason it took so long that there were no officers present on the yard. We don't see them for hours at times." (Id.)

**C.    Inmate John D. New's "Sworn Declaration":**

In his "Sworn Declaration," Inmate New states that he witnessed the murder and death of Inmate Eugene Anderson at MOCC. (Document No. 58-1, p. 3 and Document No. 69-5, p. 9.) Inmate New further states that he can "attest to the lack of correctional staff that was not present in the yard leading to the 1 ½ hours that he laid on the yard." (Id.) Inmate New states that he "whole heartedly believes if COs were doing their job and patrolling the yard, he would have had a chance to live by receiving medical treatment." (Id.) Inmate New asserts that "instead the COs gathered in the yard in front of the mess hall and were standing, joking around." (Id.)

**D.    Inmate Brandon Shepard's "Sworn Declaration":**

In his "Sworn Declaration," Inmate Shepard states that he physically assaulted two inmates while in the yard at Mount Olive when he started serving his sentence in 2017. (Document No. 58-1, p. 4 and Document No. 69-5, p. 10.) Inmate Shepard asserts that he "assaulted both inmates with extreme malice due to the fact that very rarely there were any COs on the yard to prevent such assaults and/or murders." (Id.) Inmate Shepard states that "[t]he yard was/is the typical go-to place to incur the most violence due to non-response or dereliction of duty by the officers." (Id.) Inmate Shepard states that he "believes the COs don't care about the physical wellbeing of the inmates at MOCC" and "[t]here are records proving the actions I have stated." (Id.)

**E.**    **Inmate Roy Hillberry's "Sworn Affidavit":**

In his "Sworn Affidavit," Inmate Hillberry states he has been incarcerated at MOCC from August 2012 to October 2022. (Document No. 69-1, p. 9 – 10.) Inmate Hillberry states that "[d]uring [his] time at MOCC, officers who were supposed to be working the yard routinely would not do their rounds and sit in the tower during their shifts." (Id., p. 9.) Inmate Hillberry asserts "[t]his pattern & practice was widely known by inmates, officers, shift supervisors, Superintendent Ames, Assoc. Superintendent Frame, Major Josh Ward, and others." (Id.) Inmate Hillberry states that on the evening of November 10, 2020, he was in the Quilliams II Unit, Pod 5, when Inmates Willie Jay Copley and Marcum were brought into Pod 5 for assault Inmate Wentz. (Id.) Inmate Hillberry states that "[a]ccording to other inmates & officers, yard guards Isaacs and Cutlip were nowhere to be found on the MOCC recreation yard that evening." (Id., p. 10.) Inmate Hillberry states that "video footage of Nov. 10, 2020, will show that these officers were delinquent in their duties & allowed this assault to occur." (Id.) Finally, Inmate Hillberry asserts that "[i]f this pattern and practice of yard guards sitting in the tower and not doing their rounds was not allowed by senior staff members, this assault may have not occurred or at least could have been stopped in time that the damage could have been minimized." (Id.)

**F.**    **Inmate Tex G. Holbrook's Affidavit:**

In his Affidavit, Inmate Holbrook states that he was housed at MOCC from February 2007 until November 2023. (Document No. 77-1.) Inmate Holbrook states that "the majority of the MOCC inmate population were/are fully aware of the serious lack of manned security on the recreation yard [and] MOCC has been aware of this problem for decades." (Id., p. 1.) Inmate Holbrook asserts that "[t]he numerous accounts of inmate physical assaults and acts of cold

blooded murders that have and continue to occur on the MOCC recreation yard is proof of inmates' knowledge of the un-manned recreation yard and how this situation creates the ideal condition for inmates, who desire to intentionally attack, rob, physically assault and/or murder follow inmates." (Id.) Inmate Holbrook states that he witnessed the November 10th attack upon Plaintiff. (Id.) Specifically, Inmate Holbrook explains as follows:

***

3.      This was the situation on the evening/night of November 10, 2020. This is/was when Inmate Holbrook had been walking the yard for exercise. This is also when Inmate Holbrook witnessed Inmate Charles Wentz walking with at least two other inmates who were all getting along with each other as evidenced by their laughter and casual conversations. Inmate Holbrook witnessed these individuals together on at least five instances within an approximate two hour period and at no time were they disputing with one another. At no period were there correctional officers on the yard.

4.      It was perhaps around 9:00 pm when Inmate Holbrook made the decision to return to his housing unit (Pine Hall Side I) in preparation of inmate count time. Reiterated is the fact that at no time during this time frame was there ever any correctional officers patrolling the MOCC recreation yard.

5.      Inmate Holbrook had entered Pine Hall Side I and a short time later is when Inmate Holbrook was in route to use the telephone (that is located at the large box windows that provide an unobstructed view of the Pine Hall patio and recreation yard). This was when Inmate Holbrook visually witnessed Inmate Charles Wentz leaving his cell. Inmate Holbrook and Inmate Wentz greeted one another in passing and Inmate Wentz exited Pine Hall as Inmate Holbrook proceeded to the telephone area at the bay windows.

6.      While about to use the phone is when Inmate Holbrook witnessed Inmate Wentz speaking with two of the inmates Inmate Wentz had been in the company of just moments earlier. One inmate was a tall, slim white male and the second inmate was an approximate six foot tall 300 plus pound white male, who was suspiciously glancing in areas of the recreation yard while smiling and it appeared they were jokingly speaking with Inmate Wentz while in a causal conversation.

7.      At this point is when Inmate Holbrook witnessed the two inmates physically attack Inmate Wentz for, what appeared to be, no apparent reason. The attack quickly escalated to the point that Inmate Wentz was beaten to the ground/concrete surface of Pine Hall's patio.

11

8.      It was at this point when the two inmates began kicking and literally stomping Inmate Wentz's head and body. It was obvious that Inmate Wentz was unconscious and completely unresponsive as he laid lifeless just beyond the Pine Hall Side One bay windows where the 300 plus pound inmate ruthlessly continued to use his feet to stomp Inmate Wentz's head for what seemed like forever.

9.      By the time the 300 pound inmate finally stopped and left the scene of the horrific physical assault, is when Inmate Holbrook and every other inmate who witnessed the incident truly believed that Inmate Wentz was deceased/dead.

10.      At no time during the physical assault were there any correctional officers present on the recreation yard.

11.      Approximately 20 minutes would elapse BEFORE Correctional Officer Matthew Isaacs arrived on the Pine Hall patio where he discovered Inmate Wentz unconscious with his face and skull obviously crushed. When Correctional Officer Mathew Isaacs rolled Inmate Wentz from his side onto his back is when Inmate Holbrook, and several other inmates, witnessed that Inmate Wentz's entire face and head was crushed so severely that it literally quivered like a bowl of Jello. Inmate Wentz exhibited no signs of life and was completely unrecognizable.

(Id., pp. 1 – 3.) Inmate Holbrook states that the "brutal physical assault of Inmate Wentz is merely one of countless examples of inmates being physically assault, robbed, and/or murdered due solely to MOCC"s failure to ensure the constant presence of correctional officers during recreation time on the recreation yard." (Id., p. 3.) Inmate Holbrook asserts that "[i]t is more than likely that had correctional officers been present on and patrolling the MOCC recreation yard, Inmate Wentz would NOT have been physically assaulted to the point of death that resulted in injuries so severe that he had to have major reconstructive surgery on his face that has left Inmate Wentz with lifetime disfigurement and severe symptoms of PTSD." (Id.)

**G.      Plaintiff's Deposition:**

In his Deposition, Plaintiff states he was attacked by Inmates Willie Copley (aka "Willie Jay") and Benjamin Marcum while he was located at the outside patio area of Pine Hall at MOCC

on November 10, 2020. (Document No. 74-1, p. 2.) Plaintiff explains that on the day of the attack, he had been in the "rec area all day." (Id., p. 3.) Plaintiff states he remembers talking to Inmate Willie Jay and "everything was fine." (Id., p. 4.) Plaintiff acknowledges that he "thought" both Inmates Willie Jay and Marcum were "friends" prior to the attack. (Id., p. 5.) Plaintiff states that he had never had any altercations with Inmate Marcum and he always had "good rapport" with Inmate Marcum. (Id.) After he was assaulted by Inmates Willie Jay and Marcum, Plaintiff acknowledges that he was flown by helicopter to the CAMC in Charleston for emergency medical treatment. (Id., p. 16.) Plaintiff states that he had been an inmate at MOCC for three years prior to the November 10th attack, and he had never been assaulted in the "rec yard" prior to that date. (Id., p. 17.) Plaintiff acknowledges that prior to the November 10th attack, he had never complained to anyone at MOCC about the alleged lack of supervision of correctional officers in the "rec yard." (Id., pp. 17 – 18.) Plaintiff further affirms that none of the named Defendants had any information to forewarn them that Plaintiff was in danger of being assaulted on November 10, 2020. (Id., pp. 18 - 20.) Plaintiff acknowledges that he cannot factually dispute an investigative recording of Inmates Willie Jay and Marcum wherein Inmates Willie Jay and Marcum stated that Plaintiff had "been drinking that evening, that Marcum requested alcohol from [Plaintiff], [Plaintiff] refused to give it to him, and that caused him to be mad, upset and/or contributed to the assault."[3] (Id., pp. 18 – 19.) When asked to clarify his claim, Plaintiff states as follows: "If there would have been officers out there, they could have prevented the damage. I'm not saying they could prevent the assault. They could have stopped them for nearly beating me to death. It could have been

---

[3] Plaintiff's medical records from CMAC reveals that Plaintiff had "alcohol intoxication" when he was admitted on November 10, 2020. (Document No. 69-1, p. 2.) Defendants, however, did not submit such investigative recordings as an exhibit to their Motion.

minimized. I have to live the rest of my life with my face disfigured." (Id., p. 6.)

As to Defendant Ames, Plaintiff states he is claiming that Defendant Ames "allowed his subordinates to run and practice the same thing every day" regarding the lack of officers patrolling the yard. (Id., pp. 7 – 8.) As to Defendant Frame, Plaintiff states Defendant Frame is "on that yard daily," "he knows exactly what's going on in the yard," "knows how dangerous the yard is," and "he continues to not care and to allow [correctional officers] to continue to just not be on the yard." (Id., p. 9.) Plaintiff states that he believes it is the duty of Defendants Ames and Frame to ensure there is always at least one correctional officer present in the yard. (Id., pp. 9 – 10.) Plaintiff states that the correctional officers "walk the yard, go unit to unit, do a security, then they'll disappear" and "there's not an officer's presence on the yard." (Id., p. 10.) Plaintiff contends that "[t]here should be officer presence" in the yard at all times when inmates are present. (Id.) Plaintiff acknowledges that he is not aware of any instruction or direction by Defendants Ames or Frame for correctional officers to not monitor the yard or of any action by Defendants Ames or Frame to remove officers from the yard. (Id., pp. 10 – 11.) Although Plaintiff acknowledges that Defendants Ames and Frame took action over the violence in the yard, Plaintiff explains that the action was only short term. (Id., p. 11) Specifically, Plaintiff explains as follows:

> [T]hey have taken action over the violence on the yard to put everybody in and let one unit out at a time for months on top of months. And they let the yard right back out the way it was again and right back the way it was. Now they've made - - they - - they've done that knowing that people's lives are in danger with no - - with no officers on the yard. And they continue to go right back to the same thing over and over again.

(Id.)

As to Defendant Ward, Plaintiff states that he is employed as a Major and is over security

at MOCC. (Id., pp. 11 – 12.) Plaintiff states that Defendant Ward is aware of "how serious that yard is" and he made no "effort to change and fix the assaults, to fix the murders." (Id., p. 12.) Plaintiff complains that Defendant Ward "creates hostile environments" by placing inmates in units together that don't belong together. (Id.) In support, Plaintiff states that "they'll tell them they have issues and they still put them on the units together." (Id.)

As to Defendant Isaacs, Plaintiff states that Defendant Isaacs was "on yard detail." (Id., p. 13.) Plaintiff states the Defendant Isaacs wasn't in the yard at the time of the attack, and "[h]e supposed to be on the yard watching over the yard." (Id.) Plaintiff explains his basis for concluding that Defendant Isaacs was "supposed to be on the yard" was the fact that Plaintiff had "seen Isaacs earlier that night." (Id.) Plaintiff, however, acknowledged that he was unaware of any policy or requirement as to how may officers are supposed to be "on the yard." (Id., pp. 13 – 14.) Plaintiff stated in his experience at other prisons, there is always at least one officer "on the yard" at all times when inmates are present on the yard. (Id., p. 14.) Plaintiff states that MOCC does not have at least one officer present on the yard at all times when inmates are present in the yard. (Id.) Plaintiff states that on November 10, 2020, Defendant Isaacs only made his patrol through the yard every 45 minutes to an hour and sometimes it was as long as two hours. (Id., p. 15.)

As to Defendant Cutlip, Plaintiff alleges that Defendant Cutlip's assigned post was the "rec yard" and he wasn't on the yard at the time of the attack. (Id.) As to Defendant Cavendish, Plaintiff alleges Defendant Cavendish "has control over that shift . . . making sure his guards are on their assigned post at their duties" and "he turns a blind eye." (Id., p. 16.)

**H.    Incident Report by Sergeant Matthew Isaacs:**

On November 11, 2020, Defendant Isaacs prepared an Incident Report detailing the events

15

that occurred on November 10, 2020. (Document No. 69-1, pp. 5 – 6 and Document No. 69-5, pp.

7 - 8.) Specifically, Defendant Isaacs described the incident as follows:

> At approximately 0130 hours [on November 11, 2020], while reviewing the camera footage of an inmate on inmate assault on pine hall patio along with Corporal Dennis Cutlip and Investigator Curtis Dixon. I did notice Inmate Marcum, Benjamin OID# 3559338 kick I/M Wentz, Charles OID#3556883 multiple times in the head and neck area while I/M Wentz was on the ground. After kicking I/M Wentz in the head what appeared to be multiple times, he did then exit the area and begin to proceed back to his housing unit. After reviewing the camera footage Cpl. Cutlip and I did proceed to Stuart Hall side one cell # 118 which houses I/M Marcum and did retrieve one pair of white Nike shoes belonging to I/M Marcum with what appears to be blood on them. At that time, I/M Marcum did complain of his right ankle hurting him and not being able to walk properly due to his injury. After collecting I/M Marcum's property and taking pictures of his injuries with Camera # 14512, we did then exit Stuart One without any further incidents. Due to Inmate Marcum, Benjamin OID #3559338 actions, I am charging him with Policy Direction 325.00, rule # 1.02, Assault and/or Battery (1) Assault Battery resulting in serious injury (A) no weapon.

(Document No. 69-1, p. 5 and Document No. 69-5, p. 7.)

**I.    Incident Report by Sergeant Alan Moore:**

On November 11, 2020, Sergeant Moore prepared an Incident Report detailing the events

that occurred on November 10, 2020. (Document No. 69-5, pp. 1 – 2, 5 - 6.) Specifically, Sergeant

Moore described the incident as follows:

> At approximately 0159 hours Inmate Wentz, Charles OID # 3556883, housed in Pine Hall Side Two Cell #222, was admitted to the Charleston Area Medical Center – General Division STICU Bed #8. Corporal TreShaun McDowell and Correctional Officer One Kaitlin Montgomery are currently providing security. A call down was completed and attached to an incident report.

(Id., pp. 1 and 5.)

**J.    Incident Report by Licensed Practical Nurse Tom White:**

On November 11, 2020, Nurse White prepared an Incident Report detailing the events that

occurred on November 10, 2020. (Document No. 69-1, pp. 7 – 8 and Document No. 69-5, pp. 3 –

16

4.) Specifically, Nurse White described the incident as follows:

> On Tuesday, 10 November 2020, at approximately 2130 hours, while working my assigned post in the Medical Unit, I, Licensed Practical Nurse, Tom White received a phone call from Central Control stating a nurse needed to go to Pine Hall by Institutional Ambulance due to an inmate down and not responsive. I, LPN Tom White was transported to Pine Hall by Institutional Ambulance. Upon exiting the Institutional Ambulance, I, LPN Tom White, observed an inmate lying on the patio. Inmate Wentz, Charles OID # 3556883 was identified at this time. It was determined to transport Inmate Wentz to the Medical Unit immediately. Inmate Wentz was put in the Institutional Ambulance and transported to the Medical Unit. Upon arrival to the trauma room, Charge Nurse David Stephenson RN assumed the assessment.

(Document No. 69-1, p. 7 and Document No. 69-5, p. 3.)

LPN Michelle McKinney prepared a "Man-Down/Injury Report" following the incident on

November 10, 2020. (Document No. 2-1, p. 2.) LPN McKinney described Plaintiff's injuries as

follows:

> Called to housing unit d/t "Fight in Pine Hall, bring stretcher." Upon arrival, pt was laying outside, on pavement, in front of housing unit door, on left side, surrounded by a large amount of blood. Pressure dressing was applied to open laceration at bridge of nose and taken via gurney, by institutional ambulance, to medical for further assessment. DCR in process of notifying EMS at this time. Upon arrival at medical pt was taken to trauma room, charge RN notified. Pt was nonverbal but did respond to verbal stimuli with grunting. Breathing noted with gurgling d/t possible aspiration. Pt's hair saturated with blood with no apparent lacerations found on scalp. Face had severe edema, laceration to bridge of nose with active bleeding. No measurements obtained of lacerations d/t time frame of emergent situation. Active bleeding from nostrils with areas of clotting noted. Possible small amount of bladder incontinence noted on pants.

(Id.) RN David Stephenson noted as follows:

> Mr. Wentz was involved in an altercation in which he received multiple head trauma. Upon arrival to the trauma room, he was semiconscious, bleeding from the nose and mouth. A shoe print noted on the right side of his face. No visible signs of trauma to his trunk. A 20 gage angiocath right AC establish. EMS quickly arrived and stated that Mr. Wentz would be transported to CAMC General via Health Net.

(Id., p. 3.)

## THE STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-moving movant." Wai Man Tom v. Hospitality Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)(citations omitted.); also see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(A "material fact" is a fact that could affect the outcome of the case); CTB, Inc. v. Hog Slat, Inc., 954 F.3d 647, 658 *4th Cir. 2020)("A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict of the nonmoving party."); FDIC v. Cashion, 720 F.3d 169, 180 (4th Cir. 2013)(A "genuine issue" of material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor). "The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact." Wai Man Tom, 980 F.3d at 1037. The moving party may satisfy this burden by showing that the non-moving party has failed to prove an essential element of the non-moving party's case that the non-moving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim.). Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. See Celotex Corp., 477 U.S. at 325,

18

106 S.Ct. 2548; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986); <u>also see</u> <u>Wai Man Tom</u>, 980 F.3d at 1037(citation omitted)("[T]o survive the motion for summary judgment, [the non-moving party] may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate specific, material facts exist that give rise to a genuine issue.") Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. <u>Anderson</u>, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); <u>Perry v. Kappos</u>, 2012 WL 2130908, * 3 (4th Cir. 2012)(<u>quoting</u> <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356; <u>also see</u> <u>Sedar v. Reston Town Center Property, LLC</u>, 988 F.3d 756, 763 (4th Cir. 2021)("The requirement to construe the facts, and all reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [the court] to accept cherry-picked snippets of the testimony divorced from their context."). Additionally, the court is not allowed to make credibility determinations or weigh the evidence at the summary judgment stage. <u>Stanton v. Elliott</u>, 25 F.4th 227, 234 (4th Cir. 2022)(noting that the disbelief in a non-moving party's ability to succeed on the merits is insufficient to grant summary judgment). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate. <u>See</u> <u>Moss v. Parks Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993)(Summary judgment is proper where it is apparent from the record that "no

106 S.Ct. 2548; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986); <u>also see</u> <u>Wai Man Tom</u>, 980 F.3d at 1037(citation omitted)("[T]o survive the motion for summary judgment, [the non-moving party] may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate specific, material facts exist that give rise to a genuine issue.") Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. <u>Anderson</u>, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); <u>Perry v. Kappos</u>, 2012 WL 2130908, * 3 (4th Cir. 2012)(<u>quoting</u> <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356; <u>also see</u> <u>Sedar v. Reston Town Center Property, LLC</u>, 988 F.3d 756, 763 (4th Cir. 2021)("The requirement to construe the facts, and all reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [the court] to accept cherry-picked snippets of the testimony divorced from their context."). Additionally, the court is not allowed to make credibility determinations or weigh the evidence at the summary judgment stage. <u>Stanton v. Elliott</u>, 25 F.4th 227, 234 (4th Cir. 2022)(noting that the disbelief in a non-moving party's ability to succeed on the merits is insufficient to grant summary judgment). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate. <u>See</u> <u>Moss v. Parks Corp.</u>, 985 F.2d 736, 738 (4th Cir. 1993)(Summary judgment is proper where it is apparent from the record that "no

reasonable jury could find for the nonmoving party.")

## ANALYSIS

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Social Services, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States.

## A.    Claims Against Defendants in their Official Capacities:

Although not specifically addressed in Defendants' Motion for Summary Judgment (Document No. 74), Plaintiff's claims against Defendants in their official capacities seeking monetary damages must be dismissed because Defendants are immune from such liability under the Eleventh Amendment. Suits against a state or state agencies for monetary damages are barred by the Eleventh Amendment to the United States Constitution.[4] See Will v. Michigan Dept. of State Police, 491 U.S. 58, 66, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989). The Eleventh Amendment protects states from being sued in federal court on the basis of state law. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 117, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984);

---

[4] The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

Westinghouse Elec. Corp. v. West Virginia Dept. of Highways, 845 F.2d 468, 470 (4th Cir.), cert. denied, 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 116 (1988). The Eleventh Amendment immunity not only applies to states and state agencies, but extends to suits filed against state officials when "the relief sought and ordered has an impact directly on the State itself." Pennhurst, 465 U.S. at 117, 104 S.Ct. at 917. See also Fauconier v. Clarke, 966 F.3d 265, 279-80 (4th Cir. 2020)(an individual that is employed by an arm of the State and is sued in his or her official capacity is immune from suit under the Eleventh Amendment); Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996)("This immunity extends to 'arm[s] of the State,' (citations omitted) including state agencies and state officers acting in their official capacity. (citations omitted)). "Neither a state nor its officials acting in their official capacities are 'persons' under § 1983." Will, supra, 491 U.S. at 71, 109 S.Ct. at 2312. In Will, however, the Supreme Court held that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State." Id.; also see Frew v. Hawkins, 540 U.S. 431, 437, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004)("the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law").

A person acting under color of state law can be sued in either his or her official or personal capacity for violating a prisoner's constitutional rights. Thus, a prison official may be sued in his or her personal capacity for the official's own acts or omissions occurring under color of state law. If the prison official is sued in his or her personal capacity, the prison official may be liable for money damages. If the prison official, however, is sued in his or her official capacity, the prison official may not be sued for money damages because the official is entitled to sovereign immunity. In Hafer, the Court explained that the real party in interest in an official capacity claim is the

governmental entity and the target of the claim is the entity's policy or custom. Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." Id. To the extent Plaintiff seeks monetary damages from the Defendants in their official capacity, the undersigned finds that Plaintiff's claims are barred by the Eleventh Amendment and should be dismissed. See Adams v. Ferguson, 884 F.3d 219 (4th Cir. 2018)("[T]he Eleventh Amendment does not bar an award of damages against an official in his personal capacity that can be executed only against the official's personal assets.") In his Revised Amended Complaint, Plaintiff states that he is suing Defendants in both their individual and official capacities. (Document No. 58.) As relief, Plaintiff requests declaratory, injunctive, and monetary relief. (Id.) To the extent Plaintiff has asserted official capacity claims against Defendants seeking monetary relief, the undersigned respectfully recommends that the District Court dismiss Plaintiff's claims.

**B.      Eighth Amendment Claim:**

In his Revised Amended Complaint, Plaintiff alleges that Defendants acted with deliberate indifference to his safety and health on November 10, 2020, by failing to ensure adequate security personnel in the recreation yard at MOCC. (Document No. 58.) Plaintiff alleges that Defendants Ames, Frame, Ward, and Cavendish knew that a risk of serious harm existed in the main recreation yard at MOCC because incidents of inmate attacks and murders occurring in yard were longstanding and well documented over the years. (Id.) Plaintiff states that despite Defendants Ames, Frame, Ward, and Cavendish's knowledge of the foregoing serious risk of harm, Defendants failed to provide adequate security by ensuring that at least one correctional officer was present on the yard at all times. (Id.) Plaintiff alleges that Defendants Isaacs and Cutlip were both assigned to patrol the main recreation yard on the night of November 10, 2020, and both were

aware of the serious risk of harm inmates faced on the yard. (Id.) Despite the foregoing knowledge, Plaintiff asserts that neither Defendant Isaacs nor Defendant Cutlip maintained a presence on the yard on the night of November 10, 2020. (Id.) Due to the lack of officer presence on the yard on the night of November 10, 2020, Plaintiff alleges that two inmates were allowed to easily attack and nearly kill him without any intervention or response by correctional officers. (Id.)

In their Motion for Summary Judgment and Memorandum in Support, Defendants argue that Plaintiff cannot establish Defendants were deliberately indifferent to Plaintiff's safety. (Document No. 74 and Document No. 75, pp. 7 – 9.) Defendants argue that "[i]t is undisputed based upon Plaintiff's own admission that none of the Defendants possessed the actual knowledge or believed that Plaintiff was at a risk of physical assault on the day in question or actually, at any time within his three-year stint at Mt. Olive." (Document No. 75, p. 8.) Specifically, Defendants state that "Plaintiff had never had an altercation with either of the inmates who assaulted him." (Id., p. 8.) Defendants assert that Plaintiff "never complained or commented to any Defendant or staff member at Mt. Olive about a concern with the inmate(s) who assaulted him." (Id.) Defendants claim that "Plaintiff's argument that prior incidents of assaults involving other inmates, over time, cannot create a material issue of fact that any of the Defendants named in his Complaint had been deliberately indifferent to Plaintiff's rights or safety." (Id.) Therefore, Defendants conclude that "[b]ecause the Plaintiff cannot establish that any of the Defendants knew that Plaintiff faced a substantial risk of serious harm and failed to intervene or failed to create a presence at a specific time and location on the recreation area, and more importantly because he admitted that Defendants did not have the requisite knowledge or forewarning of any such risk, it is proper for this Court to enter an Order granting summary judgment as to all defendants." (Id., p. 9.)

In Response, Plaintiff argues there are issues of material fact and a jury could find

Defendants acted without deliberate indifference to Plaintiff's safety when viewing the evidence in a light most favorable to Plaintiff. (Document No. 78.) First, Plaintiff states that that "the harm alleged by the Plaintiff – being brutally beaten and without any help – is sufficiently serious to fulfill the objective component." (Id., p. 3.) Second, Plaintiff contends Defendants were aware of substantial risk to his safety because the risk was obvious and the "risk of inmate assault was longstanding, pervasive, well-documented, or expressly noted by Defendants." (Id., p. 4.) Plaintiff notes that "actual knowledge does not require that the Defendant know the Plaintiff would with certainly be harmed, or that the Plaintiff would be harmed in a particular way." (Id.) Plaintiff contends that there is an issue of material facts as to whether Defendants were aware of the substantial risk to Plaintiff's safety and were deliberately indifferent to that risk by failing to ensure that at least one correctional officer was on the yard at all times. (Id., p. 6.) As an Exhibit, Plaintiff attaches a copy of the Affidavit of Inmate Holbrook. (Document No. 77-1.)

In Reply, Defendants argue that "Plaintiff's actual evidence submitted in response to the properly supported motion and his own admissions in his deposition clearly do not establish there is an actual, material issue of fact in this case as to the elements of objective and subjective component." (Document No. 79, p. 2.) Defendants claim that "Plaintiff has presented no admissible evidence that any of the Defendants had actual knowledge of a pending assault to Plaintiff by the two named inmates and there is also no circumstantial evidence from which this knowledge could be inferred." (Id.) Defendants assert that "Plaintiff's argument that there is a material issue of triable fact for a jury is based upon pure speculation and conjecture." (Id.) Defendants argue that Plaintiff "presented no admissible evidence from discovery what would support a factual finding that the assault upon him by Marcum and/or Copley was foreseeable by anyone, at any time." (Id.) Defendants explain that Plaintiff admitted during his deposition that

24

"he had no meaningful interaction with Marcum or Copley before the assault," he "had no conflict with either inmate before the assault and the assault as unprovoked and not foreseen," and "there was no evidence that any of the Defendants had 'any reason to believe that he was going to be assaulted on that day." (Id.) Defendants further note that Plaintiff admitted during his deposition that "event had there been a guard(s) in the recreation area at the exact time of the assault, there is no evidence that the assault would not have occurred in actuality, he admitted that the assault would still likely have occurred." (Id., p. 4.) Defendants assert that Plaintiff "has not presented any evidence of any inmate-on-inmate assault while he was at Mt. Olive." (Id., pp. 3 – 4.) As to Inmate Holbrook's Affidavit, Defendants contends the "affidavit further supports the fact that the assault on Plaintiff had no forewarning." (Id., p. 3.) As to the Sworn Declarations of Inmates Harrison, Zell, New, and Shepard, Defendants assert that their statements relate to events occurring in 2017 and 2019. (Id.) Defendants, therefore, claim that these Sworn Declarations "are not sufficient statements that create a material issue of fact that any of the Defendants in this case acted with deliberate indifference to the health and safety of Plaintiff" and "[n]one of the statements mention inmates Copley or Marcum." (Id.) Defendants conclude that "Plaintiff has presented no sufficient, admissible evidence in this case or in response to the Motion, to support a finding that there is a material issue of fact a jury could rely upon to support a finding against any of the Defendants, especially the administrative Defendants." (Id., p. 5.)

As a general matter, punishments prohibited under the Eighth Amendment include those that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77

F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Thus, sentenced prisoners are entitled to reasonable protection from harm at the hands of fellow inmates and prison officials under the Eighth Amendment. See Farmer v. Brennan, 511 U.S. 825, 832-34, 114 S.Ct. 1970, 1976-77, 128 L.Ed.2d 811 (1994); Trop v. Dulles, 356 U.S. 86, 102, 78 S.Ct. 590, 598-99, 2 L.Ed.2d 630 (1958); Woodhous v. Commonwealth of Virginia, 487 F.2d 889, 890 (4th Cir. 1973). Thus, officials must take "reasonable measures to guarantee the safety of the inmate." Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d. 393 (1984). In other words, "[t]he government and its officials are not free to let the state of nature take its course." Farmer, supra, 511 U.S. at 833, 114 S.Ct. at 1977; also see Makdessi v. Fields, 789 F.3d 126, 136 (4th Cir. 2015)("Prison officials, from the security officers to the mental health professionals and grievance coordinators, have an ongoing constitutional obligation to protect inmates from each other.") The burden, however, is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one. Whitley v. Albers, 475 U.S. 312, 325, 106 S.Ct. 1078, 1087, 89 L.Ed.2d. 251 (1986).

To establish a violation of the Eighth Amendment in the context of a failure to protect claim, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Farmer, supra, 511 U.S. at 834, 114 S.Ct. at 1977. To satisfy the objective component, Plaintiff must show that the challenged condition caused or constituted an extreme deprivation. De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). To demonstrate an

"extreme deprivation," a plaintiff "must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from [his] exposure to the challenged conditions." Odom v. South Caroline Dept. of Corrections, 349 F.3d 765, 770 (4th Cir. 2003); also see Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)(A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities."); White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") To satisfy the subjective component, Plaintiff must demonstrate a "deliberate indifference" to his health and safety by defendants. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. A prison official is not liable if he or she "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id., 511 U.S. at 844, 113 S.Ct. at 1982; also see Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997)(finding that a prison official was not liable because he did not actually draw the inference that the inmate was exposed to a substantial risk of serious harm). A showing of mere negligence does not qualify as deliberate indifference. Davidson v. Cannon, 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); also see Whitley, supra, 475 U.S. at 319, 106 S.Ct. at 1084 ("[O]bduracy and wantonness, not inadvertence . . . characterize the conduct prohibited by [the Eighth Amendment]").

Direct evidence of actual knowledge, however, is not required. Farmer, supra, 511 U.S. at

27

842, 114 S.Ct. at 1981. A prison official's subjective actual knowledge can be proven through circumstantial evidence, such as the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." Farmer, supra, 511 U.S. at 842, 114 S.Ct. at 1981. The Fourth Circuit has acknowledged that subjective knowledge component is nuanced. See Makdessi, supra, 789 F.3d at 137-38(finding that the district court failed to appreciate nuances with respect to this component). Specifically, the Fourth Circuit explained that the " 'actual knowledge' standard required to find prison officials deliberately indifferent to a substantial risk of serious injury may be proven by circumstantial evidence." Id. at 129. "Prison officials may not simply bury their heads in the sand and thereby skirt liability." Id. "Rather, they may be held accountable when a risk is so obvious that it had to have been known." Id. Therefore, "even under this subjective standard, a prison official cannot hide behind an excuse that he was unaware of risk, not matter how obvious." Id. at 133; also see Porter v. Clarke, 923 F.3d 348, 361 (4th Cir. 2019)("[A]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.") Additionally, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)(internal quotation marks omitted).

In their Motion for Summary Judgment, Defendants rely heavily on the fact that Plaintiff has not alleged that the Defendants had any specific knowledge that Inmates Copley and Marcum

28

posed a threat to Plaintiff. It is well recognized, however, that a prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." <u>Farmer</u>, <u>supra</u>, 511 U.S. at 843, 114 S.Ct. 1970. Additionally, the Fourth Circuit has stated that "it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom." <u>Makdessi</u>, <u>supra</u>, 789 F.3d at 135(citing <u>Farmer</u>, 511 U.S. at 844-44, 114 S.Ct. 1970). Defendants further assert that Plaintiff never reported any concerns for his safety prior to the November 10th attack. Plaintiff, however, has alleged that MOCC had a common practice of allowing the recreation yard to be rarely patrolled by a correctional officer combined with a longstanding history of inmate-on-inmate attacks occurring in the yard. Plaintiff asserts this longstanding history of prior inmate-on-inmate attacks made the risk obvious or gave Defendants specific knowledge that an incident of inmate-on-inmate attack was likely to occur due to the lack of correctional officer presence in the yard. In support, Plaintiff attaches inmate affidavits stating that inmate-on-inmate attacks were common in the recreation yard at MOCC due to the lack of correctional officer presence. Inmate Harrison states that he was involved in an inmate-on-inmate attack in the yard at MOCC in 2017, and there had been no correctional officer present on the yard for over one hour. (Document No. 58-1, p. 1 and Document No. 69-5, p. 12.) Inmate Zell states that he was the victim of an inmate-on-inmate attack in the yard at MOCC in 2019. (Document No. 58-1, p. 2 and Document No. 69-5, p. 11.) Inmate Zell states there was no correctional officer present at the time of the attack and corrections officers are not present in the yard "for hours at times." (<u>Id.</u>) Inmate New states that he witnessed another inmate get murdered in the yard at MOCC and there was no correction officer present. (<u>Id.</u>) Inmate New states that the murdered inmate laid in the yard for 1

½ hours before a correctional officer was present to find the murdered inmate. (Id.) Inmate Shepard states that he was the victim of an inmate-on-inmate attack in the yard at MOCC in 2017, and there was no correctional officer present on the yard at the time of the attack. (Document No. 58-1, p. 4 and Document No. 69-5, p. 10.) Inmate Shepard states correctional officers are rarely present on the yard and "[t]he yard was/is the typical go-to place to incur the most violence due to non-response or dereliction of duty by the officers." (Id.) Inmate Hillberry states he was incarcerated at MOCC from 2012 to 2022 and it was a common pattern and practice for correctional officers to not be present in the yard. (Document No. 69-1, p. 9 – 10.) Inmate Holbrook states he was incarcerated at MOCC from 2007 to 2023, and the "serious lack of manned security on the recreation yard" it was a common practice "for decades." (Document No. 77-1.) Inmate Holbrook further states that he was present in the yard at MOCC on the day Plaintiff was attacked, and there was a total lack of correctional officer presences for a two hour period of time. (Id.)

### (i)    *Defendants Isaacs and Cutlip:*

First, the undersigned will consider Plaintiff's deliberate indifference claim against Defendants Isaacs and Cutlip. Considering the undisputed evidence in a light most favorable to Plaintiff, the undersigned finds that Plaintiff can satisfy the objective component that the challenged condition caused an extreme deprivation. A review of record indicates that Plaintiff suffered serious and significant physical injuries as a result of the November 10th attack. Next, the undersigned will consider whether Defendants Isaacs and Cutlip acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. Plaintiff has presented evidence that risk of harm to Plaintiff was obvious because inmate-on-inmate attacks were a common occurrence in the yard due to the lack of security/correctional officer presence. See Makdessi, supra, 789 F.3d at137-38(stating that "even under the subjective standard, a prison official cannot hide behind an

excuse that he was unaware of a risk, no matter how obvious"); Porter, supra, 923 F.3d at 361("an obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate"). Construed in the light most favorable to Plaintiff, the evidence creates a genuine issue of material fact as to whether the risk of an inmate-on-inmate attack was obvious due to the lack of correctional officer presence in the yard and whether Defendants Isaacs and Cutlip acted with deliberate indifference by failing to be present in the yard for extended periods of time when both were assigned to patrol the yard on the night of November 10, 2020. See Rivera v. Mathea, 2019 WL 6133727, * 5 (4th Cir. Nov. 19, 2019)(denying summary judgment on deliberate indifference claim nothing that "[o]nce prison officials become aware of a problem with prison conditions, they cannot simply ignore the problem, but should take corrective action where warranted."); Makdessi, 789 F.3d at 134(citation omitted)("[E]ven a guard able to prove that he was in fact oblivious to an obvious injury of sufficient seriousness may not escape liability if it is shown, for example, that he merely refused to verify underlying facts that he strongly suspected to be true, or that he declined to confirm inferences of a risk that he strongly suspected to exist."). Based on Defendants Isaacs and Cutlip's knowledge of the prior incidents and lack of security on the yard, a reasonable juror could find that Defendants Isaacs and Cutlip knew of a substantial risk from the very fact that the risk was obvious. Accordingly, the undersigned respectfully recommends that Defendants Isaacs and Cutlip's Motion for Summary Judgment (Document No. 74) be denied as to the foregoing claim.

### (ii)    *Defendants Ames, Frame, Ward, and Cavendish:*

Next, the undersigned will consider Plaintiff's supervisory liability claim against Defendants Ames, Frame, Ward, and Cavendish. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. * * *

Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the officials own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1936, 1948, 173 L.Ed.2d 868 (2009); see also Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001), cert. denied, 537 U.S. 1045 , 123 S.Ct. 621, 154 L.Ed.2d 517 (2002)("In a Bivens suit there is no respondeat superior liability. * * * Instead, liability is personal, based upon each defendant's own constitutional violations." (Citation omitted.)); Monell, supra, 436 U.S. at 694, 98 S.Ct. at 2018("the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability"). Liability can be premised, however, "on a recognition that supervisory indifference or 'tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984), cert. denied, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). To establish liability under Section 1983 for a supervisory defendant, the plaintiff must establish the following:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Thus, a plaintiff must show "a pervasive and unreasonable risk of harm from some specified source and that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" Slakan, 737 F.2d at 373. Evidence of a supervisor's continued inaction in the face of documented widespread abuses provides an independent basis for finding he or she either was deliberately indifferent or

32

acquiesced in the constitutionally offensive conduct of his or her subordinates. Id. A supervisor's mere knowledge of a subordinate's unconstitutional conduct is not enough. Rather, Section 1983 liability may be imposed upon a supervisor only on the basis of purposeful "violations of his or her supervisory responsibilities." Ashcroft, 556 U.S. at 676, 129 S.Ct. at 1949. Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

In his Revised Amended Complaint, Plaintiff alleges that Defendants Ames, Frame, Ward, and Cavendish were aware of the substantial risk to his safety because the risk of inmate-on-inmate attacks in the yard was obvious and "longstanding, pervasive, well-documented, or expressly noted by Defendants." Plaintiff asserts that Defendants Ames, Frame, Ward, and Cavendish engaged in supervisory tacit authorization by knowingly allowing an inadequate security presence in the yard and permitting correctional officers to engage in the reckless custom and/or practice of failing to adequately patrol the yard. Plaintiff asserts that the evidence indicates Defendants Ames, Frame, Ward, and Cavendish had actual or constructive knowledge of the correctional officers' conduct and the risks it posed to inmates, that their responses to the risks were inadequate and showed deliberate indifference, and that there is a link between Defendants' deliberate indifference and the injuries suffered by Plaintiff. A review of the record indicates that there was a total lack of security presence for extended periods of time in the recreation yard at MOCC and inmate-on-inmate attacks were a common, longstanding occurrence in the yard. See Farmer, supra, 511 U.S. at 842, 114 S.Ct. at 1981(A prison official's subjective actual knowledge can be proven through circumstantial evidence, such as the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the

circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it.") Construing the evidence in the light most favorable to Plaintiff, there are genuine questions of material fact concerning the following: (1) Whether there was a total lack of security presence for extended periods of time in the recreation yard and whether such created a substantial risk of harm to Plaintiff; (2) Whether Defendants Ames, Frame, Ward, and Cavendish knew of this risk and acted with deliberate indifference to that knowledge; and (3) Whether Defendants Ames, Frame, Ward, and Cavendish took any steps to ensure a security presence in the yard or other efforts to reduce the number of inmate-on-inmate attacks. As discussed above, Plaintiff has provided affidavits from other inmates noting incidents of inmate-on-inmate attacks in the yard and that a total lack of security presence in the yard was a common practice or occurrence at MOCC. This creates a genuine issue of material fact as to whether at Defendants Ames, Frame, Ward, and Cavendish adopted a reckless custom or practice of failing to ensure an adequate security presence in the yard at MOCC. See Stephens v. South Carolina Department of Corrections, 2018 WL 3215644, * 3 (D.S.C. June 12, 2018)("Plaintiffs' allegations that various correctional officers left their assigned wings unattended and, in some instances, left inmate room doors unlocked, are sufficient to state a claim that [defendants] failed to properly train their subordinates in correct policies and procedures given the known incidents of violence within the facility"), report and recommendation adopted, 2018 WL 3209709 (D.S.C. June 29, 2018). Based upon the foregoing, the undersigned respectfully recommends that Defendants Ames, Frame, Ward, and Cavendish's Motion for Summary Judgment (Document No. 74) be denied as to Plaintiff's supervisory liability claim.

## C.    **Qualified Immunity:**

In their Motion for Summary Judgment and Memorandum in Support, Defendants argue

that Plaintiff's claims are barred against all of the Defendants by the doctrine of qualified immunity. (Document No. 74 and Document No. 75, pp. 5 - 7.) Specifically, Defendants argue that they are entitled to qualified immunity because "Plaintiff cannot put forth any genuine issue of fact to attempt to establish that these Defendants violated any clearly established statutory or constitutional rights of which a reasonable person would have known." (Document No. 75, p. 6.) Defendants explain that "Plaintiff has sued a number of Defendants within the chain of authority and staff at Mount Olive, simply speculating that there is a presumption everyone knew that there were inherent risks present on the recreation areas to inmates for assault." (Id.) Defendants contend that Plaintiff merely speculates correctional officer presence would have impacted the severity of his injuries. (Id.) Defendants claim that the "assault lasted no longer than just a few seconds"[5] and "logic also dictates that the presence of an officer could not have stopped the altercation for lasting only seconds." (Id.) Defendants further assert that "Plaintiff's claim challenges the subjective determination and policy decisions around staffing, and he simply speculates that correctional officer presence 100% of the time in the yard could have resulted in his 10 second assault having been shorted." (Id., pp. 6 – 7.) Defendants conclude that "[t]his argument is entirely speculative and not supported by any evidence of fact." (Id., p. 7.)

In Response, Plaintiff argues that Defendants are not entitled to qualified immunity. (Document No. 78, pp. 6 – 7.) Plaintiff asserts Defendants "have violated [his] clearly establish constitutional rights as guaranteed under the Eighth Amendment of the United States Constitution." (Id., p. 7.)

---

[5] In the "Undisputed Facts Established by Discovery" section of Defendants' Memorandum in Support, Defendants state that "[t]he assault was captured on video and the assault occurred for a period of 10 seconds." (Document No. 75, p. 2.) The undersigned, however, notes that Defendants failed to attach the video or an affidavit establishing such a timeframe.

Courts have established qualified immunity for government officials in consideration of a number of factors including the substantial cost of litigation against government officials, the distraction of government officials from their public responsibilities and the disincentive to responsible and capable persons to accept government positions if there is no protection against suits accusing them of misconduct in the performance of their public duties. Government officials performing discretionary functions are generally protected from civil damages liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In determining the validity of a qualified immunity defense, the Court should be guided by a two-prong test: (1) whether the facts viewed in the light most favorable to the Plaintiff establish a deprivation of an actual constitutional right; and (2) whether that right was clearly established at the time of the purported violation. Id. The sequence of the steps is immaterial following Pearson. The Court may exercise discretion in deciding which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." Id. at 818. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 *4th Cir. 2013)(internal quotation marks and citations omitted).

In the instant case, Defendants argue they are entitled to qualified immunity because "Plaintiff cannot put forth any genuine issue of fact to attempt to establish that these Defendants violated any clearly established statutory or constitutional rights of which a reasonable person would have known." It, however, has long been established that prison officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other

prisoners. See Farmer, supra, 511 U.S. at 833, 114 S.Ct. at 1977. As explained above, questions of material fact exist as to whether Defendants violated Plaintiff's clearly established rights. See Newkirk v. Enzor, 674 Fed.Appx. 276 (4th Cir. 2017)(affirming denial of summary judgment on qualified immunity where facts remained in dispute); Vathekan v. Prince George's County, 154 F.3d 173, 180 (4th Cir. 1998)("[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants"); Hollabugh v. Cartledge, 2016 WL 1142353, 9 (D.S.C. March 7, 2016)(denying summary judgment on qualified immunity "as it was certainly clearly established during the time period at issue that even supervisory personnel can be subject to liability for having either direct knowledge of, or having created a policy or practice exercised by their subordinates, sufficient to create a situation from which an inference could be drawn that a substantial risk of harm existed and being deliberately or callously indifferent to the substantial risk of serious harm"). The undersigned, therefore, respectfully recommends that Defendants' Motion for Summary Judgment (Document No. 74) be denied concerning Defendants' claim of qualified immunity.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT in part and DENY in part** Defendants' Motion for Summary Judgment (Document No. 74). Specifically, it is recommended that Defendants' Motion for Summary Judgment (Document No. 74) be granted as to Plaintiff's official capacity claim against Defendants requesting monetary damages and denied concerning all other claims asserted against Defendants.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is

hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Berger and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: March 18, 2025.



Omar J. Aboulhosn
United States Magistrate Judge